# In the United States Court of Federal Claims

No. 13-964C
(Filed:  April 7, 2014)
**\*Opinion originally filed under seal on March 26, 2014**

<table>
<tr><td>

OCEAN SHIPS, INC.,

            Plaintiff,

v.

THE UNITED STATES,

            Defendant,

and

PATRIOT CONTRACT
SERVICES, LLC.,

      Defendant-Intervenor.

</td>
<td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td>
<td>

**Bid protest; best value procurement; deference to technical and past performance evaluation; failure to timely challenge terms of a solicitation.**

</td>
</tr>
</table>

    *Lars E. Anderson*, Tysons Corner, VA, for plaintiff.  *James Y. Boland* and *Anna E. Pulliam*, Tysons Corner, VA, of counsel.

    *Michael D. Snyder*, Civil Division, U.S. Department of Justice, Washington, DC, with whom were *Stuart F. Delery*, Assistant Attorney General, and *Bryant G. Snee*, Acting Director, Commercial Litigation Branch, for defendant.  *Scott Scheffer*, Military Sealift Command, Washington, DC, of counsel.

    *Craig S. King*, Washington, DC, for defendant-intervenor.  *Stewart S. Manela*, *Patrick R. Quigley*, and *Christopher A. Bowen*, Washington, DC, of counsel.

## O P I N I O N

**FIRESTONE**, *Judge*.

In this bid protest case, Ocean Ships, Inc. ("plaintiff" or "OSI") challenges the decision by the Navy's Military Sealift Command ("MSC") Prepositioning Program[1] to award a small business set-aside contract for the operation and maintenance of eight large government-owned sea vessels to Patriot Contract Services LLC ("Patriot" or "the defendant-intervenor").  Plaintiff, the incumbent contractor, argues that the $ * * *[2] award should be set aside for two reasons.

Plaintiff first asserts that MSC was obligated to amend the Request for Proposals ("RFP") and solicit revised final proposals because of a mandatory wage rate escalation that allegedly occurred _after_ MSC announced its intent to award the contract to Patriot, but before the final award was made.  Specifically, plaintiff argues that _during_ the delay occasioned by OSI's challenge of Patriot's status as a small business before the Small Business Administration ("SBA"), OSI entered into an extension contract with MSC. Plaintiff further contends that under the Collective Bargaining Agreements ("CBA") between OSI and some of its unions, this extension triggered a mandatory 4% wage increase for at least some of its workers.  OSI and the government agree that this wage increase is binding on the contract-awardee under the terms of the RFP.[3]  Although the

---

[1] The Prepositioning Program strategically places military equipment and supplies aboard ships located in key ocean areas to ensure rapid availability during a major theater war, a humanitarian operation, or other contingency.  MSC maintains 26 prepositioning ships in support of the Army, Navy, Air Force, Marine Corps, and Defense Logistics Agency.  Administrative Record ("AR") 5969.

[2] This amount assumes that the parties exercise all four one-year option periods after the one-year base period.

[3] As discussed _infra_, Patriot argues that the wage increase is not binding.

terms of the CBA were included in the Department of Labor wage determination that was included in the RFP, none of the offerors appear to have accounted for the wage increase in their proposed pricing because it had not been triggered at the time bidding closed. OSI thus contends that the award should be set aside because the 4% wage increase amounted to a material change to the RFP that required MSC to solicit a new round of proposals.

OSI also argues that MSC did not make a proper best value award determination because the Source Selection Authority ("SSA") failed to properly apply the stated Technical and Past Performance evaluation criteria in its evaluation.  Specifically, OSI asserts that MSC failed to rate OSI's Past Performance submission sufficiently higher than Patriot's, improperly concluded that their respective Technical proposals were of equal value, and thus arbitrarily and capriciously rendered a best value determination in favor of Patriot.  In this connection, OSI also faults MSC's best value determination for failing to account for what OSI believes will be Patriot's higher reimbursable training costs than those incurred by the other offerors.[4]

Presently before the court are the parties' cross-motions for judgment on the administrative record under Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC") and plaintiff's motion for a permanent injunction.  As discussed below, the court finds that the 4% wage increase did not trigger MSC's obligation to amend the RFP, however, even assuming that the 4% wage increase did give rise to a material

---

[4] OSI does not dispute, however, that the RFP omitted reimbursable costs, including training, from MSC's price evaluation.

change in the RFP, the court finds that plaintiff has failed to demonstrate that OSI was

prejudiced by MSC's refusal to reopen bidding.  Specifically, OSI has not demonstrated

how reopening bidding to allow offerors to submit revised bids to account for the 4%

increase would have significantly improved OSI's chance for award.  The court also finds

that OSI has not met its burden to demonstrate that MSC's evaluation of the proposals or

best value determination were arbitrary or capricious.  For all of these reasons, the court

**DENIES** plaintiff's motion for judgment on the administrative record and **GRANTS** the

United States' cross-motion for judgment on the administrative record.

## I.    STATEMENT OF FACTS[5]

### a.  The scope of the RFP

MSC issued RFP N00033-13-R-3210 on December 20, 2012, which sought

proposals for the operation and maintenance of eight WATSON Class Large, Medium

Speed Roll On/Roll Off ("LMSR") vessels in various operating statuses.[6]  AR 112, 114,

5969-70.  Each WATSON Class LMSR is approximately 950 feet in length, and is

comprised of diverse mechanical and electrical components. AR 5969-70.  The vessels

---

[5] Unless otherwise stated, these facts are undisputed and are taken from the complaint, the
parties' briefs, and the Administrative Record.

[6] In evaluating offerors' experience with "ocean-going" vessels, MSC counted vessels in both
"full operational status" ("FOS") and "reduced operational status" ("ROS"). AR 5972.  ROS
vessels operate with reduced crews that spend a substantial amount of time pier-side, but can be
ready to set to sea within a specified number of days (often four days).  Id.  Although the term
"ocean going vessels" was not defined in the RFP, MSC explained that the ordinary meaning of
the term within the industry includes ROS vessels, because they are designed for, and capable of,
travel on the ocean.  Id.  Both Patriot and OSI listed ROS vessels in their Past Performance
submissions, AR 2702, 3126, 3161, and MSC credited both ROS and FOS vessels as potentially
relevant when evaluating Past Performance.

are powered by two gas turbine engines which, though less common in commercial use due to their high fuel consumption rates, are not unusual.  Id.  These engines are useful for prepositioning vessels in austere locations because they require little complicated maintenance and are relatively small units that can be replaced if broken beyond basic repair.  Id.  MSC maintains spare gas turbine engines in its inventory, which can be flown to most worldwide locations for this purpose.  Id.

Section M of the RFP provided for a pass-fail evaluation of certain "threshold requirements" and a "trade-off" for other requirements.  As to the former, offerors had to demonstrate that within the past 15 years, they possessed at least 10 years of experience simultaneously operating at least two "ocean-going" ships of no less than 4,500 tons and 10,000 horsepower, and that they had experience managing at least two drydockings of greater than $5 million in final cost or greater than 30 days in final duration.  AR 579. An offeror that failed to satisfy these requirements would be considered technically unacceptable and thus ineligible for award.  Id.

For the "trade-off" analysis, MSC considered three factors: (1) Management Approach, (2) Past Performance, and (3) Price.  Management Approach was more important than Past Performance, and non-price factors when combined were significantly more important than price.  AR 580.  However, the importance of price increased as the non-price differences between offers diminished.  Id.  In addition, the RFP provided:

> An overall adjectival rating will be assigned to each of the Management
> Approach and Past Performance factors as a result of the source selection
> evaluation.  In assigning these ratings, the evaluators will consider, for each

factor, the offeror's ability to exceed the minimum performance
requirements of this solicitation (under the Management Approach factor),
and the risk of nonperformance, defective performance or late performance
under the resulting contract.

AR 580.

### b.  RFP provisions related to the Service Contract Act

The McNamara-O'Hara Service Contract Act of 1965 ("SCA"), 41 U.S.C. § 6702

et seq. (2012), was enacted to provide wage and other protections to service employees

working under U.S. government contracts.  See James C. Fontana, Employer Obligations

Under the Service Contract Act: Just Another Minimum Wage Law?, 25 Pub. Cont. L.J.

483, 485 (1996).  Among other things, the SCA and its implementing regulations require

that contractor employees who provide services to the federal government be paid at least

as much as the "prevailing" wage and fringe benefits paid to employees providing similar

services in similar work in the same locality.  Id.  The Department of Labor is responsible

for determining the prevailing wages that constitute the floor for service employees.  Id.

As a general rule, the SCA does not apply to contracts that provide services outside of the

United States.  41 U.S.C. § 6702(a)(3).

Although the proposal instructions directed offerors to "assume that the Service

Contract Act . . . applies to all wages and fringes," AR 576, the RFP also included a

provision recognizing that the SCA might not apply because some or all of the work

would be performed overseas.  Specifically, the RFP stated:

It is possible that ships under this contract could be forward deployed for
the entire contract period.  Although (in accordance with FAR 22.1003-2)
SCA compliance is not required for work performed outside the [United
States], in the interest of attracting and retaining the best qualified/

experienced civilian mariners and to reduce performance risk, the contractor is required to pay its mariners at the minimum wage and fringe benefit levels contained in the Department of Labor . . . Wage Determination included in Attachment B under Section J of the Contract. The contract per diem rate for all contract periods shall be inclusive of anticipated escalation for all price components, to include wage and fringe benefits and associated costs.  The Government will only entertain Requests for Equitable Adjustment in accordance with FAR 52.222-43 when the Service Contract Act applies (i.e. when performance occurs within the territorial waters of the U.S.).

AR 539.  Accordingly, offerors were required to certify that "wages and fringe benefits included in its proposed pricing and to be paid to crewmembers compl[ied] with the Service Contract Act minimum wages and fringe benefits identified in the wage determination attached to" the solicitation.  AR 573, 650.

The RFP included a copy of a January 4, 2013 Department of Labor's wage determination, which was based upon two CBAs[7] entered into by OSI and its service unions for performing services under the fourth option period of OSI's prior contract with MSC.  AR 711-50.  One of the CBAs addressed compensation for officers in the American Maritime Officers ("AMO") labor union,[8] and one addressed compensation for

---

[7] Regarding CBAs, the RFP also stated:

> (f) Collective Bargaining Agreements (CBA).  If applicable, offerors shall provide current documents that are signed and dated by the parties.  However, the terms of the CBA between the contractor and the union are neither considered to be a part of the contract nor form the basis of any claim or request for equitable adjustment (REA).

AR 572.

[8] The AMO CBA was first entered into on September 29, 2008 (and wages were subsequently amended for option years), and states that it is to remain "in full force and effect for the duration of its resultant agreement between [OSI] and MSC . . . ."  AR 716.

unlicensed mariners in the Seafarers International Union ("SIU").  Id.

       With regard to wage escalations, the AMO CBA stated:

> There shall be a four percent (4%) increase of Total Labor Costs (TLC)
> effective each anniversary date [October 1] for the duration of this
> agreement and any extension thereof.  The anniversary date of the contract
> shall be established as the commencement of operation of the first vessel.[9]
> The Union reserves the right to allocate the wages or benefits of Officers
> employed hereunder, the amounts resulting from this revision as it deems
> appropriate.  TLC is defined to include all rates of pay (Base Wages and
> [Nonwatch Standing Allowances]), overtime rates, all other forms of
> compensation paid, and all benefit contributions.  TLC excludes feeding,
> transportation, overlap costs, and taxes.

AR 720.  Thus, the RFP identified the potential for a 4% wage increase under the AMO

CBA in the event OSI's contract was extended beyond October 1, 2013.  Regarding

unlicensed mariners, the SIU CBA stated that "in the event this Agreement is extended

beyond the option periods, the Company and the Union shall meet to negotiate all

economic terms and conditions."  AR 748.[10]

       OSI, Patriot, and the other offerors certified that the proposed wage rates and

fringes set forth in their offers met or exceeded those included in the Department of

Labor's wage determination identified above.  See AR 2579, 2879, 3348, 3775.

Accordingly, MSC found that all of the offerors complied with the RFP's SCA

certification requirement.  AR 5118.

---

[9] There is no dispute amongst the parties that October 1 is the "anniversary date."

[10] While there was a 4% increase in total labor costs for "Years 2 through 5," the SIU CBA states
that after that time "all economic terms and conditions" will be "negotiate[d]."  AR 748.  In the
wage determination, the Department of Labor states that it "does not recognize . . . prospective
wage rates and fringe benefit provisions that are effective only upon such contingencies," and
further states that the "contingency language" does not "reflect[] [an] arm's length negotiation"
under "section 4(c)" of the Service Contract Act (now codified as 41 U.S.C. § 6707(c)).

### c. Proposal submissions and evaluations

Five offerors submitted proposals on the initial due date, February 7, 2013, including OSI and Patriot.  AR 4203.  All five, however, were found technically unacceptable, and MSC decided to enter into discussions because "[n]one of the proposals presented issues sufficient to exclude them from the competitive range."  AR 4211-12, 4215.  At this stage, one of the bidders withdrew from consideration.  AR 5116.  MSC then conducted three rounds of discussions with the four remaining offerors.  AR 5115-17.

### i. Evaluation of  the "Ship Operational Experience" threshold requirement

In its Technical Proposal, to satisfy the "ship operational experience" threshold requirement, Patriot provided a chart displaying the vessels it had operated over the past fifteen years, AR 3126, 3161-62, which included both FOS and ROS vessels.  Patriot also submitted the following narrative description of its experience:

> Patriot Contract Services, LLC (PATRIOT) was established in 1997 and is a full service U.S. Government and commercial ship manager with a long history of success in all facets of vessel operations.  PATRIOT's experience includes managing multiple Military Sealift Command (MSC) assets.  We also have significant additional relevant operational experience through the company's operation and maintenance of MARAD vessels, as well as construction, maintenance, and operation of commercial containerships. We are fully qualified to manage the eight Watson Class LMSR vessels.  As shown in Attachment 1 and Fold-out 1, PATRIOT's management of relevant vessels over the last 15 years includes 34 specific vessels/contracts accounting for some 2 million gross registered tons of maritime assets.  We have accomplished this by utilizing our collective manning pools of more than 5,000 active U.S. Merchant Marine Officers and unlicensed mariners. Since 1997, PATRIOT has simultaneously operated as many as 23 ocean going ships greater than 4,500 tons and 10,000 HP, with no fewer than 6 under our management at any given time.

AR 3125.  MSC's Technical evaluators reviewed Patriot's narrative and associated

charts, and found Patriot to have met the "Ship Operational Experience" threshold

requirement.  AR 4986-87.  OSI, as the incumbent, also satisfied this threshold

requirement.

### ii.  Evaluation of Patriot and OSI's Technical/Management Approach factor

#### 1.  Management Approach evaluation criteria

Section M of the RFP provided as follows regarding Management Approach:

The Government will consider the Organizational Charts, Key Shore Side[11] Personnel Resumes and Organizational Narrative submitted by the offerer, as specified under Section L-15.B.(c).B.I, in evaluating this factor. The following factors will be considered:

a.  The offeror's organizational structure and program management approach, and the feasibility of that approach to conduct day-to-day operations, and coordinate and collaborate with Government

b.  The relevance of the proposed Key Personnel's qualifications, experience, education, expertise, and skill levels in relation to their assigned roles.

AR 580.

Relatedly, Section L directed offerors to provide the following as part of their

Management Approach proposals:

(a) Organizational Charts: Offeror shall provide organizational charts . . . that depict the structure it will utilize in the management

---

[11] Regarding shipboard personnel (in contrast to shore side personnel), the U.S. Coast Guard regulates mariner qualifications through a comprehensive credentialing regime.  AR 475, 477, 5970.

of a potential contract. . . .

(b) Key Shore Side Personnel Resumes: For the individuals
identified above as Key Shore Side personnel (in accordance with
Section C-3.3.1 [of the Statement of Work]), the Offer[or] shall submit
current resumes . . . .

(c) Organizational Narrative: Offeror shall explain the role of each
individual designated as Key Shore Side Personnel and discuss
how the organizational structure will function as an entity to meet
contract requirements in the areas of Management Approach,
Program Management, Engineering, Vessel Operations, Property
Management, and Budget Management.

AR 575.  Depending on the number of strengths[12] and weaknesses assigned to each

proposal, offerors would receive a rating of Outstanding,[13] Good,[14] Acceptable,

Marginal, or Unacceptable.  AR 65.

---

[12] The RFP defined "strengths" as follows:

> Strength means an aspect of the proposal that exceeds minimum requirements and
> expectations, or represents an added benefit to the Government and is expected to
> increase the quality of the offeror's performance.  Strengths are typically high
> quality personnel, facilities, organizational structures and or technical approaches
> that allow an offeror to perform the work cost effectively or at a higher level of
> quality.

AR 66  (emphasis added).

[13] A proposal was to receive a rating of "Outstanding" if it "meets requirements and indicates an
exceptional approach and understanding of the requirements."  AR 65.  "Outstanding" proposals
contained strengths that "far outweighed" any weaknesses, as well as a very low risk of
unsuccessful performance.  Id.

[14] A "Good" rating was appropriate if the "[p]roposal meets requirements and indicates a
thorough approach and understanding of the requirements."  AR 65.  "Good" proposals were
required to contain strengths that outweighed any weaknesses, and a low risk of unsuccessful
performance.  Id.

## 2. Patriot's and OSI's Management Approach submissions and evaluation

For the Management Approach Technical tradeoff factor, Patriot submitted an organizational narrative, AR 3128-58, an organizational chart, AR 3132, and proposed key shore side personnel resumes, AR 3164-3200.  Upon final evaluation by the Technical Evaluation Team ("TET"), Patriot received an overall rating of "Good" for the Management Approach Technical tradeoff factor.  AR 4986.  Patriot's Management Approach was assessed to have eleven strengths (of which seven related to the quality of Patriot's proposed personnel) and no weaknesses or deficiencies.  AR 4988-95.  In addition to personnel-based strengths, Patriot was credited for its explanation of how new hires would be integrated into the organization and a proposed weekly vessel-by-vessel materiel status report.  AR 4992.  The TET summarized the quality of Patriot's Management Approach as follows:

> Patriot's FPR3 [third proposal] was rated as GOOD.  Their proposal indicated a thorough approach and understanding of the requirements. They were able to successfully address the sole Weakness identified in their FPR2 [second proposal] proposal.  The documented Strengths may increase the quality of performance.  There are no outstanding Clarifications, Omissions[,] Weaknesses, or Deficiencies.  Risk of unsuccessful performance is low.

AR 4986.

For the Management Approach Technical tradeoff factor, OSI submitted an organizational narrative, AR 2655-64, four organizational charts, AR 2706, 2708-10, and

proposed key shore side personnel resumes, AR 2665-98.[15]   Upon final evaluation by the

TET, OSI received an overall rating of "Good" for the Management Approach Technical

tradeoff factor.  AR 4980.  OSI's Management Approach was assessed to have seventeen

strengths (of which eleven related to the quality of OSI's proposed personnel) and no

weaknesses or deficiencies.  AR 4981-85.  In addition to personnel-based strengths, OSI

was credited for several management practices designed to facilitate communication

across the organization.  AR 4981-83.  The TET summarized the quality of OSI's

Management Approach as follows:

> FPR2 [second proposal] - OSI submitted all revised documents in
> accordance with Government requirements.  They were able to successfully
> resolve all outstanding Omissions, Clarifications, and Weaknesses.  They
> demonstrated a thorough approach and understanding of the requirements.
> Their strengths are such that increased quality of performance to the benefit
> of the Government is expected.  Risk of unsuccessful performance is low.
> FPR3 [third proposal] - OSI did not submit FPR3 technical documents.
> The evaluation summary remains valid.

AR 4980.

The Source Selection Advisory Council ("SSAC") compared Patriot's and OSI's

proposed Management Approach Technical tradeoff factors, considered the strengths

identified in each, AR 5170-72, 5180-82, and concluded:

> OSI and Patriot both offer technical approaches exceeding the minimum
> requirements of the RFP, and the benefits offered by each are different in
> their focus.  In particular, OSI's technical approach offers additional
> benefits in its proposed communications practices and its proposed

---

[15] As part of the "Solicitation Package" portion of its proposal, OSI submitted the CBA with its unions, which in turn included a training syllabus used in the past.  AR 2488-2547.  Section L-15A(f) of the RFP stated, however, that CBAs do not become part of the contract.  AR 572.  OSI did not reference the training syllabus in its Management Approach submission.  AR 2643-64.

operations department, and Patriot's technical approach offers additional benefits in its proposed materiel management practices.  Though substantively different, these proposed management practices are of comparable value to the government.

AR 5183.

The SSA concurred, stating:

Having reviewed the TET report, having been briefed by the TET, and having compared the information conveyed in those reports and briefings against the proposed organizational structures outlined in the technical proposals; I concur with the TET's assessment that all of the management approaches proposed warrant a Good rating.  The SSAC tradeoff recommendation details differences among the reports, but concludes that, though different, the technical proposals all display management approaches of similar overall quality.  Having reviewed the rationale of that recommendation in conjunction with the TET report, TET briefing, and proposed organizational structures; I concur with the SSAC's reasoning and conclusion.

AR 5188.

### iii.  Evaluation of Patriot and OSI's Past Performance

#### 1.  Past Performance evaluation criteria

With respect to evaluation of Past Performance, Section M of the RFP provides as follows regarding evaluation of this factor:

Past Performance

(1) The past performance evaluation will assess the offeror's probability of meeting the solicitation requirements.  To develop an overall rating, the Government's evaluation will take into account relevant and recent information submitted by each offeror as part of its proposal and the Government's assessment and evaluation of other sources of information . . . .[16]

---

[16] Other sources of information for Past Performance may include, but are not limited to, Past Performance Information Retrieval System ("PPIRS") reports, the Federal Awardee Performance

(2) The Government will consider the company itself, predecessor companies, key personnel who have relevant experience and subcontractors who will perform major or critical aspects of the requirement.

AR 580-81.

Relatedly, Section L directed offerors to provide the following as part of their Past

Performance submissions:

(a) Offerors are requested to provide information on up to five (5) previous Government contracts whose effort is/was recent and relevant to the effort required by this solicitation.  Offerors may provide information on Government and/or Commercial contracts for which they performed as a prime or subcontractor.

i. "Recent" is defined as a contract in-progress or completed within the last three (3) years.

ii. "Relevant" is defined as a contract that is of similar scope, complexity, dollar value, and/or contract type.

a.  Scope: Similarity of services or supplies as those defined in the solicitation.

b.  Complexity: The measure of the similarity of technical difficulty, managerial intricacy, and/or required coordination of efforts and disciplines performed by the offeror and any subcontractors in its submitted contracts to the requirements outlined in the solicitation.

AR 575-76.

---

and Integrity Information System ("FAPIIS"), Electronic Subcontract Report System ("ESRS"), questionnaires and interviews.  AR 242.

## 2. Patriot's and OSI's Past Performance submissions and evaluations

Patriot submitted Past Performance data sheets for five recent contracts, which included vessels in both FOS and ROS status.  AR 3201-15.  MSC was able to obtain information about each effort from questionnaires, PPIRS, and MSC employees familiar with Patriot performance on pertinent contracts.  AR 4274, 5024-26, 6667-69.  Of the efforts submitted by Patriot for consideration, three were "Relevant," and Patriot's performance was assessed as "Exceptional" on one, "Very Good" on one, and "Satisfactory" on one.  Id.  Patriot also submitted two "Somewhat Relevant" contracts for which its performance was assessed as "Exceptional."  Id.  Based on these submissions, MSC assessed that it had "Substantial Confidence" in Patriot's ability to perform the contract.[17]  AR 5172.

OSI also submitted Past Performance data sheets for five recent contracts, which also included ships in both FOS and ROS status.  AR 2720-34.  As with the efforts submitted for consideration by Patriot, MSC was able to obtain information about each from questionnaires, the PPIRS, or MSC employees familiar with OSI's performance on pertinent contracts.  AR 4261-63, 5021-22, 6647-66.  Of the efforts submitted by OSI for consideration, two were "Very Relevant" contracts, one was a "Relevant" contract, and one was a "Somewhat Relevant" contract; and OSI's performance on each was assessed

---

[17] In the SSAC Comparative Analysis of Proposals and Award Recommendation, the SSAC concluded, "[c]onsidering Patriot's experience with Government-owned vessels, including LMSRs, and its demonstrated abilities to adapt to challenging and specialized requirements, such as the USNS Hayes and Waters contract, the Government has a high expectation that Patriot will successfully perform the required effort."  AR 5172.

as "Very Good."  Id.  OSI also submitted one "Somewhat Relevant" contract for which

its performance was assessed "Satisfactory."  Id.  Based on these submissions, MSC

assessed that it had "Substantial Confidence" in OSI's ability to perform the contract.

Id.[18]

> The SSAC compared Patriot's and OSI's Past Performance and concluded:
>
> Both Patriot and OSI received a confidence rating of "Substantial
> Confidence" with a very low risk of unsuccessful performance.  Patriot's
> past performance record includes a steady history of highly positive
> performance on three relevant and two somewhat relevant contracts
> providing the Government with Substantial Confidence in its ability to
> perform.  Similarly, OSI has demonstrated a steady history of positive
> performance under its current and recent contracts.  Uniquely, OSI has a
> highly positive history with the current WATSON class LMSR contract,
> viewed as Very Relevant as well as one other Very Relevant contract and
> several other contracts that were considered either Relevant or Somewhat
> Relevant.  Having highly positive history on two very relevant contracts,
> including the incumbent contract for this requirement, OSI's demonstrated
> past performance is slightly superior to Patriot's.

AR 5183.

The SSA concurred, stating:

> Having reviewed the Past Performance Evaluation Team (PPET) report and
> having been briefed by the PPET, I concur with the PPET's evaluation and
> ratings of the offerors' past performance.  Based on information represented
> in the PPET report and my analysis and assessment of the information, I
> concur that OSI has the highest rating for this trade-off factor and a slight

---

[18] After award, the contracting officer explained that

> [i]n considering scope and complexity of prior efforts for purposes of determining
> which were more or less relevant, MSC considered whether the effort was an
> MSC contract, vessel size, vessel mission; whether the vessel was ROS or FOS;
> and the number of vessels operated under the contract.  Whether vessels operated
> on prior efforts were powered by gas turbine engines was not considered.

AR 5980.

advantage over Patriot; and that Patriot and OSI have evidenced past performance that displays a lower element of risk to the government than [the other offerors], and agree they have done so because they have displayed highly-rated performance on more similar past work . . . .  With respect to demonstrated past performance, the SSAC tradeoff recommendation concludes that the Government has a high expectation that Patriot will successfully perform the required effort, and I concur with the SSAC's reasoning and conclusion.

AR 5188.

### iv.  Patriot's and OSI's Price submissions and evaluations

The RFP indicated that the resulting contract would be a fixed-price contract paid at a per diem rate, with certain limited reimbursements by the government at invoice price (i.e., exclusive of overhead and administrative expenses which are compensated through the fixed-price per diem).  AR 11-12, 452, 570.  The proposal instructions directed offerors to fill out three pricing forms (Forms A, B, and C) for each period of the contract.  Offerors were to input information into Form A that would be used to calculate the total per diem price for each year.  Offerors were to input daily wages, overtime, fringe benefits, and applicable taxes for each applicable crew position into Form C.  The RFP further explained that "[t]he rates proposed in Pricing Sheets A and C shall be inserted into Pricing Sheet B, which will multiply the proposed rates by the applicable number of . . . days for each contract year.  Form B will be used to determine the Total Estimated Contract Price for evaluation purposes."  AR 576-77.  The parties do not

dispute that training, some of which was reimbursable, was not included in the

description of items that would be evaluated as part of the price proposal.[19]

OSI's proposed total price was $ * * *, which was $ * * * (roughly 2.8%) more

than Patriot's proposed total price of $ * * *.  AR 5170.

### v.  MSC's best value determination

The SSAC recommended award to Patriot.  AR 5169-70.  In comparing the two

offers in their entirety, including the three tradeoff factors of Technical, Past

Performance, and Price, the SSAC concluded:

> Patriot's and OSI's proposals are of comparable quality in management
> approach; while OSI's proposal presents a slight advantage in past
> performance and Patriot's proposal offers an advantage in price.  We have
> compared the two proposals and, after considering the relative merits of
> each, are unable to identify any aspects of OSI's proposed management
> approach that warrant payment of a higher price, nor are we able to justify
> award to OSI at [a] $ * * * premium in price based upon its slightly
> superior demonstrated past performance.  For these reasons, award to OSI
> does not represent the best value to the government.  Considering each
> offeror's proposed management approach, past performance, and price,
> Patriot offers a proposal that represents the best value to the Government.
> Patriot's management approach demonstrates a sound understanding of the
> requirements and includes strengths that provide benefit to the Government,
> while its highly positive record of recent and relevant past performance
> provides substantial confidence that it will successfully perform the

---

[19] The RFP made clear that training was required both at the beginning and throughout the
contract period.  For example, Section C (Descriptions and Specifications) subsection 1.8
(Contract Training Requirements) stated: "The contractor shall ensure that each mariner meets
all Federal . . . training requirements that are presently in effect or may be imposed . . . in the
future. . . . The costs of such training are for the contractor's account."  AR 381.  Under
subsection 1.8.2 ("Cost of MSC/Navy Required Training"), some of training costs would be
reimbursable.  Id.  ("Costs associated with MSC/Navy required training and drills are
reimbursable according to the per diem/travel for Federal Employees under the Joint Travel
Regulations (JTR) in effect at the time of travel.  Wages will only be reimbursable when a
crewmember is not assigned to a vessel.  Course completion certificates shall be included with
invoices for reimbursement.").

> requirement.  Patriot's offer is also the lowest priced offer, at $ * * *.  In accordance with the Source Selection Plan and the RFP, it is recommended that award of the proposed contract should be made to Patriot.

AR 5183-84.

On August 28, 2013, the SSA selected Patriot's offer as representing the best value to the government.  AR 5186-89.  The SSA explained its reasoning as follows:

> I have been briefed by the Contracting Officer, Chairpersons of the Technical Evaluation Team (TET), Source Selection Evaluation Board (SSEB) and Source Selection Advisory Council (SSAC).  I have reviewed the individual Evaluation Reports and SSAC's analysis and recommendation, and considered the evaluation and comparative assessments of the strengths, weaknesses and risks of the proposals conducted by the SSAC, which I agree with and hereby adopt as my own.  I concur with the ratings assigned and I have determined that award should be made to Patriot.  This decision represents my independent judgment.
>
> . . .
>
> Considering the technical proposals, and past performance against the prices offered, I have determined Patriot's offer to represent the best value to the government.  Although the non-price factors are significantly more important than price, the slight advantage in past performance, the least important non-price factor, is insufficient to overcome the premium in price offered by OSI.  In particular, given the similarity in quality of technical proposals and limited differences in displayed past performance, I note (as reflected at M-1B.III of the RFP) that the importance of price will increase as differences in the quality of proposals decrease.
>
> In accordance with the Source Selection Plan and the RFP, I have determined that award of the proposed contract should be made to Patriot.  Said contract, if all options are exercised and all work is fully performed, will result in a total cost to the Government of $ * * *.

AR 5187-89.

### d.  OSI's size protest and subsequent request to re-open discussions

On September 3, 2013, following the best value determination, MSC sent notice of Patriot's selection as the apparent awardee to the offerors.  Actual award was to be made five business days thereafter.  AR 5196-5203.  However, on September 9, 2013, OSI protested Patriot's size status to the contracting officer, who then sent it on to the SBA, thereby delaying the award.  AR 5204-09, 5372.  On September 20, 2013, while OSI's size protest was still pending,[20] MSC informed OSI that it intended to extend OSI's contract.  See AR 6005.  On September 30, 2013, MSC extended OSI's incumbent contract without issuing a notice under FAR 22.1010.[21]  AR 5999.  On that same day, MSC requested that each offeror extend their offers until March 31, 2014.  AR 6095-96, 6186-87, 6266-67, 6368-69.  All offerors agreed to extend their offers.  AR 6098, 6188, 6265, 6371.

Also on September 30, 2013, OSI and AMO signed a new Appendix A to their incumbent CBA.  AR 6022.  This new appendix required a 4% escalation in total labor costs, effective October 1, 2013.  AR 6022.  On October 2, 2013, OSI and SIU signed a new Memorandum of Understanding ("MOU"), which was effective from October 3, 2013 through September 30, 2014.  The MOU also called for a 4% increase in total labor costs for all employees.  AR 6025.

---

[20] Due to a lapse in appropriations, the SBA remained closed until October 17, 2013, and thus was unable to issue a decision.  AR 5403.

[21] A contracting officer is required to provide the incumbent contractor and its employees' collective bargaining agent written notice of a contract modification (including an extension) at least 30 days prior to performance.  48 C.F.R. § 22.1012-1.

On October 7, 2013, after having revised the agreements with its unions, OSI lodged an agency level protest with MSC arguing that with the new wage increases in effect, a new round of final proposal revisions should solicited.  AR 5866.  According to OSI, the 4% wage escalation beginning October 1, 2013 was now binding on all offerors under the terms of the RFP, and that this wage increase resulted in a "changed situation from what offerors could have expected at the time of the solicitation . . . ."  AR 5866. On October 17, 2013, the SBA denied OSI's size protest.  AR 5406.  On October 18, 2013, MSC's contracting officer determined that OSI had failed to demonstrate any prejudice from the wage rate escalation and denied OSI's protest.  The contracting officer stated:

> Your protest is without basis. Wage determination 1999-0007, Rev. 13 (attachment B to N00033-13-R-3210) remains correct for the subject RFP. The RFP has not been amended and does not require amendment.
>
> Moreover, your letter fails to provide, "a description of the resulting prejudice to your company" as required by FAR 33.103(d)(2)(iii).
>
> I hereby deny your protest.

AR 5426-27.  On that same day, the contracting officer awarded Patriot the contract.  AR 5406, 5430-31, 5433.

OSI filed a protest at the United States Government Accountability Office ("GAO") on October 25, 2013, raising many of the same arguments as it has in its protest before this court.  AR 5643-61.  Of particular relevance, OSI contended that the 4% wage rate increase required MSC to reopen discussions, arguing that the wage escalation could amount to as much as a $ * * * million increase in total price over life of the contract,

assuming all options are exercised.  OSI asserted that the RFP should be amended to give

offerors the opportunity to explain how they might absorb that increase.  AR 5657.  On

November 18, 2013, GAO granted the requests of Patriot and MSC to dismiss the protest

as related to whether the wage rate escalation required a re-opening of discussions,

stating:

> GAO does not view the Protester's allegations on this protest ground to
> constitute a cognizable basis of protest.  This protest ground is therefore
> DISMISSED, and the Agency's report need not include a response to it.
> GAO will incorporate the dismissal of this protest ground into any decision
> on the merits of the other pending protest claims.

AR 5947.  OSI subsequently withdrew its remaining protest and brought the instant

action in this court.

Plaintiff filed its complaint on December 6, 2013.  On December 12, 2013, this

court denied plaintiff's motion for a preliminary junction as moot, based on the parties'

representations that the briefing schedule would resolve the case before expiration of

OSI's contract extension.[22]  See ECF No. 15.

## II.   DISCUSSION

### a.  Standard of review

In deciding bid protest cases, the court applies the standard of review found in the

Administrative Procedure Act, 5 U.S.C. § 706 (2012).  See 28 U.S.C. § 1491(b)(4)

(2012).  A procurement decision must be upheld unless the court determines that the

agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in

---

[22] OSI's extension expires on March 31, 2014.

accordance with law." Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  In resolving questions of fact, the court may make findings "from the record evidence as if it were conducting a trial on the record." Bannum, Inc. v. United States, 404 F.3d 1346, 1357 (Fed. Cir. 2005).

The court may set aside an award decision if a protester carries its burden of showing that either "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009).  To succeed under the first prong, a plaintiff must demonstrate that it was prejudiced by an exercise of agency discretion that lacked any "coherent and reasonable explanation." Banknote Corp. of Am., 365 F.3d at 351; Norsat Int'l [Am.], Inc. v. United States, 111 Fed. Cl. 483, 493 (2013) (citing cases).  When proceeding under the second prong, the protester must show that the prejudice caused by the agency's violation was "significant," such that "there was a 'substantial chance' it would have received the contract award but for the [government's] errors . . . ." Bannum, 404 F.3d at 1353; Consol. Eng'g Servs., Inc. v. United States, 64 Fed. Cl. 617, 623 (2005).

Success under the first prong is particularly difficult in light of the substantial latitude that agency officials possess to conduct a best value analysis.  See E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) (court must defer to agency's discretion on technical ratings and other "minutiae of the procurement process"); CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1356 (Fed. Cir. 2008) (court must defer to agency's assessment of risk associated with given procurement strategy).  Deference to

procurement officials is especially pronounced in matters of Past Performance, and the court will not second-guess an agency's reasonable determination as to the relevance or weighting of an offeror's prior experience.  See Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 909 n.6, 911 (Fed. Cir. 2013) (rejecting dissent's treatment of Past Performance adjectival ratings as if they "can be added up and 'averaged out' to score the contractor"); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 718 (2010) ("Thus, when evaluating an offeror's past performance, the [Source Selection Authority] may give unequal weight, or no weight at all, to different contracts when the [Source Selection Authority] views one as more relevant than another" (internal quotation marks and citations omitted)).  Ultimately, if the record can support the agency's exercise of discretion, the court will uphold the award decision, "even though it might, as an original proposition, have reached a different conclusion . . . ."  Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)); see also R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (noting that "when an [officer's] decision is reasonable a court may not substitute its judgment for that of the agency").

It is against this backdrop that the court turns to the merits of OSI's case.  Plaintiff contends that the award to Patriot should be overturned for essentially two reasons.  First, plaintiff argues that MSC was obligated to amend the RFP and solicit revised final offers after October 1, 2013 because none of the offerors submitted price proposals that incorporated the 4% wage rate escalation that allegedly occurred on that date.  Second, plaintiff contends that MSC failed to properly apply the stated Technical and Past

Performance evaluation criteria and thus did not make a proper best value award determination.  Each will be examined in turn.

       **b.  Plaintiff has failed to demonstrate how the 4% wage increase amounts to a "material change" or how it was prejudiced by MSC's failure to amend the RFP**

Plaintiff contends that MSC arbitrarily and improperly refused to amend the RFP to allow for revised proposals after October 1, 2013, when a mandatory 4% increase in wages and fringes allegedly went into effect under the CBAs between OSI and its union(s).  From plaintiff's perspective, this increase constituted a "material change" to the original RFP because offerors had not anticipated the wage increase in their proposals.  Plaintiff relies on FAR 15.206(a), which requires the government to amend a solicitation prior to award "[w]hen, either before or after receipt of proposals, the Government changes its requirements or terms and conditions . . . ."  48 C.F.R. § 15.206.  Plaintiff further argues that because offerors might absorb some or all of the increase— rather than pass it on to MSC—plaintiff has carried its burden of demonstrating prejudice.  Plaintiff asserts that it should not have to make a more specific showing of prejudice because here, non-price factors were significantly more important than price.

In response, the government argues that the wage increase does not constitute a change within the meaning of FAR 15.206(a) because such an increase was an express term of the CBA between OSI and AMO, which was incorporated into the RFP.  As noted, that CBA stated that "[t]here shall be a four percent (4%) increase of Total Labor Costs (TLC) effective on each anniversary date for the duration of this agreement and any

extension thereof." AR 720.[23]  Moreover, the government argues, any increase triggered
by the CBAs would be binding on all offerors to the same extent.  In such circumstances,
the government contends that the 4% increase did not materially change the solicitation.
In addition, the government argues that, even assuming the 4% increase gave rise to a
material change, OSI has failed to demonstrate how it has been prejudiced by the failure
to amend the RFP.  Specifically, the government contends that OSI has not identified
how amending the solicitation and allowing offerors to revise their submissions to
account for the wage adjustment would have materially advanced OSI's ability to obtain
the award.

   The court agrees, for the same reasons stated by the government, that FAR 15.206
was not triggered by OSI's agreements to raise wages by 4% on October 1, 2013.  First,
the RFP, by including the CBA between OSI and AMO, expressly identified the potential
for a wage increase after October 1, 2013.  Therefore, nothing occurred on that day that
actually altered the solicitation's requirements.  In addition, even assuming that plaintiff
is correct that the 4% wage increase amounted to a material change,[24] plaintiff has failed

---

[23] Patriot disputes that this language obligates a successor to OSI to provide the 4% increase.

[24] In this connection, the cases on which plaintiff relies to show that the wage increase amounted
to a material change can be readily distinguished from the case at bar and most do not merit
discussion.  For example, in Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243, 246, 271-72
(2004), modified, 63 Fed. Cl. 141 (2004), the court held that award was improper due to the
unequal treatment of the offerors.  In that case, however, the agency refused to relax certain
solicitation requirements requested by the protester, while agreeing to relax similar requirements
in favor of another offeror (the eventual awardee) at closing.  The court concluded that the
unequal treatment led to the awardee submitting a final proposal in response to a different set of
requirements than those which applied to the protester.  By contrast, both OSI and Patriot
submitted final proposal revisions with the same set of assumptions concerning the applicability
of any prospective wage increases.

to show how OSI was prejudiced by MSC's refusal to amend the RFP and reopen bidding.  As previously noted, an agency's violation of procurement regulations or procedures cannot justify the setting aside of an award unless a protester demonstrates that it was significantly prejudiced by the violation.  Bannum, 404 F.3d at 1353.  Plaintiff cannot carry its burden by merely claiming that knowledge of the 4% wage escalation would have led different offerors to absorb (or pass along) different amounts of the additional cost.  See Consol. Eng'g Servs., 64 Fed. Cl. at 638-39 ("a bare assertion that [the protester] may make different staffing choices is simply insufficient to meet its burden" to show prejudice from an intervening wage determination).[25]  Particularly given that the wage increase would have applied to all offerors, plaintiff was obligated to provide a concrete explanation of how amending the RFP to account for this "change" would have led to an improved competitive position for OSI relative to the other offerors. Id.  Having failed to provide such an explanation, the court rejects plaintiff's protest on the grounds related to the purported wage increase.[26]

---

Idea Intern., Inc. v. United States, 74 Fed. Cl. 129 (2006) is also inapposite.  Idea involved a post-award modification that completely shifted the risk of nonperformance from the contractor to the government.  Id. at 141.  By contrast, the purported wage increase in the case at bar constituted only 4% of total labor costs during the first year of a firm-fixed-price contract.

[25] Notably, plaintiff does not attempt to distinguish Consol. Eng'g Servs., a case that OSI acknowledges presents similar facts as the case at bar.  See Pl.'s Mot. 17.

[26] The court is aware that Patriot disagrees with plaintiff and the government as to whether, as the awardee, Patriot is required to comply with the 4% wage increase.  Because OSI has failed to make the requisite showing of prejudice, the court need not opine on Patriot's statutory or contractual duty, if any, to cover this increase.

### c. MSC's best value decision was not arbitrary, capricious, an abuse of discretion, or contrary to law

Plaintiff challenges MSC's best value determination on the following grounds: (1) MSC failed to consider the impact of training costs that would likely be incurred by Patriot in the best value evaluation; (2) MSC conducted an improper Technical/Management Approach evaluation; and (3) MSC conducted an improper Past Performance evaluation.  As explained below, none of the plaintiff's arguments are a proper basis for overturning the award.

### i. Plaintiff has failed to demonstrate that MSC's best value determination was arbitrary or capricious

As noted, the RFP stated that pricing would be evaluated by calculating an overall price based on daily wages, overtime, fringe benefits, and applicable taxes for each applicable crew position.  Plaintiff does not assert that reimbursable training costs[27] were included in the list of costs to be considered in MSC's price evaluation to support its overall best value determination.  Nonetheless, OSI contends that when MSC performed its best value evaluation, MSC should have recognized that any cost savings in Patriot's proposal would be offset by Patriot's higher training costs.  Plaintiff asserts that MSC's decision to ignore the cost of training, which was arguably reimbursable under the

---

[27] Plaintiff initially asserted that it was irrational for MSC to exclude the cost of reimbursable training from the price evaluation.  Pl.'s Reply 24 (citing Business Clearance Memorandum in which MSC acquisition officials state, "[t]he price for [reimbursable] expenses is not considered in the total evaluated price as the expenses incurred would be very similar regardless of which offeror is successful.").  The plaintiff disputed this assumption on the grounds that employees of the unions affiliated with Patriot lacked the training possessed by the unions affiliated with all of the other offerors.  Plaintiff now argues that MSC should have found some way to take this differential in training costs into account as part of its best value determination.

contract, was premised on the erroneous assumption that expenses incurred for such costs would be similar for all offerors.  See Pl.'s Reply at 24.  According to plaintiff, Patriot "stood alone as the only offeror associated with unions that do not have officers or crew already trained and certified to serve aboard the Watson Class LMSRs."  Pl.'s Mot. 26. Plaintiff argues that if MSC had considered training costs in its price evaluation, MSC would have recognized that Patriot's contract price could have been as much as $ * * * million higher than its evaluated price.

The government responds that the plain language of the RFP prohibited MSC from considering the impact of reimbursable costs, including training, in making a best value decision, and that the award could not be sustained if MSC had rejected Patriot's offer on grounds outside the evaluation criteria.  The government also argues that, to the extent OSI believed MSC should have incorporated training costs into the price evaluation, OSI was obligated to make that challenge before award.

The court agrees with the government that MSC was not required to consider training costs as part of its best value evaluation under the terms of the RFP.  OSI was obligated to bring that challenge before award and has now waived its right to contest MSC's non-consideration of training costs under Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313 (Fed. Cir. 2007).  As noted above, the RFP did not include reimbursable training expenses among the costs that would be considered as part of MSC's price evaluation.  Plaintiff neither contends that this omission was a latent error nor identifies any good cause for its delay in raising the issue.  In such circumstances, "the bidder cannot lie in the weeds hoping to get the contract, and then if it does not,

blindside the agency about the error in a court suit." DGR Assocs., Inc. v. United States, 690 F.3d 1335, 1343 (Fed. Cir. 2012); see also FirstLine Transp. Sec., Inc. v. United States, 100 Fed. Cl. 359, 385-87 (2011) (finding challenge to price evaluation scheme based on exclusion of transition costs waived).

Put simply, MSC's decision to follow the evaluation scheme as it was presented in the RFP was not erroneous.  The court agrees with the government that, if MSC had done otherwise, MSC "would have impermissibly deviated from the solicitation's evaluation criteria." Firstline Transp. Sec., Inc., 100 Fed. Cl. at 388 (internal quotations omitted); see also 10 U.S.C. § 2305(b)(1) ("The head of an agency shall evaluate sealed bids and competitive proposals and make an award based solely on the factors specified in the solicitation."); Blue & Gold Fleet, 492 F.3d at 1313 ("The terms of the solicitation prospectus did not include any requirement that the bidders consider the Service Contract Act, and thus, the Park Service could not decide at the time of the evaluation to apply the Act.").  Accordingly, the court rejects plaintiff's contention that MSC erred by failing to consider the training costs as part of its price evaluation or best value determination.

### ii. MSC's Management Approach evaluation was not arbitrary or capricious

As noted, the SSAC concluded that although OSI's seventeen strengths and Patriot's eleven strengths were "substantively different," their respective management approaches were of comparable value to the government, AR 5183, a conclusion with which the SSA concurred, AR 5188.  Plaintiff argues that because OSI received seventeen strengths and Patriot received only eleven strengths, it was arbitrary for MSC

to assign both proposals a rating of "Good" and to treat the two proposals as providing

equal value.  Relying heavily on <u>FirstLine Transp. Sec., Inc.</u>, 104 Fed. Cl. at 371, plaintiff

suggests that by assigning the same grade to two offerors that received a different number

of strengths, an SSA impermissibly elevates the relative importance of price in the best

value tradeoff.  Pl.'s Mot. 31.  Plaintiff also contends that when the "nature of the

strengths" received by OSI and Patriot are compared, it is "clear" that OSI's Technical

proposal was better.  Pl.'s Mot. 32.  For example, plaintiff contends that it was irrational

for MSC to assign Patriot one strength for proposing * * * additional shore side

personnel, while assigning OSI only two strengths for proposing * * * additional billets.

Plaintiff also argues that OSI should have received a strength based on the quality of its

training program related to gas turbine engines and associated equipment that OSI

developed while serving as the incumbent contractor.  In response, the government and

Patriot assert that plaintiff's arguments constitute mere disagreements with the agency's

judgment, which is not a proper basis to overturn an award.  The government also

contends that because the quality of training was not listed as an evaluation criterion, the

SSA was not permitted to consider it when making the best value award determination.

The court concludes that MSC's Technical evaluation was not irrational and must

be sustained.  Contrary to plaintiff's contentions, MSC's assignment of the same

adjectival rating to both OSI and Patriot was not arbitrary or capricious.  Despite

plaintiff's belief that the court can "take judicial notice that * * * additional personnel

dedicated to the contract will provide more value to the Government in terms of

successful contract performance than * * *," Pl.'s Reply 34, the court must defer to the

agency's discretion on matters like Technical ratings or other procurement minutiae. E.W. Bliss Co., 77 F.3d at 449; Preferred Sys. Solutions, Inc. v. United States, 110 Fed. Cl. 48, 59 (2013). Indeed, "this court does not sit as a super source selection authority to second guess and re-score offerors' proposals." Patriot Taxiway Indus., Inc. v. United States, 98 Fed. Cl. 575, 586 (2011). The court cannot say that it was unreasonable to withhold an additional strength for training, and therefore cannot substitute its judgment for that of the MSC evaluators. See R & W Flammann GmbH, 339 F.3d at 1322.

Although an SSA should consider both adjectival ratings and other information on advantages and disadvantages, Mil-Mar Century Corp. v. United States, 111 Fed. Cl. 508, 553 (2013) (agreeing with Femme Comp. Inc. v. United States, 83 Fed. Cl. 704, 758 (2008) that "looking beyond the adjectival ratings is necessary because proposals with the same adjectival ratings are not necessarily of equal quality"), it is well-established that "an agency official exercising discretion need not address every piece of evidence presented in its decision." Preferred Sys., 110 Fed. Cl. at 59 (citing Rebosky v. United States, 60 Fed. Cl. 305, 312 (2004)). In this case, the SSA adopted the findings of the SSAC, which had found that OSI's Technical approach offered benefits in its communications practices and operations department, which were comparable to the benefits Patriot offered in its material management practices. AR 5183, 5188. Ultimately, plaintiff's argument constitutes mere disagreement with the judgment of the SSA, which is insufficient to set aside a contract award.

The court also agrees with the government that FirstLine Transp. Sec., Inc., 104 Fed. Cl. at 371, offers little support to plaintiff's case. In that case, the court set aside a

best value award determination after the agency assigned the same overall technical

rating to the protester, which had received thirty-three strengths and no weaknesses, as

the agency had to the awardee, which had received one weakness and only a single

strength.  Id.  The court found that "the government not only ignored the dramatic

difference in the number of strengths assigned to the proposals; it also took affirmative

steps to minimize or neutralize those differences in the SSEB report."  Id. at 378.  In

contrast to FirstLine Transp. Sec., Inc., the case at bar does not involve a dramatic gap in

the number of strengths assigned to the two proposals, and plaintiff has not uncovered

sufficient evidence of any affirmative steps to neutralize the differences between the

proposals.[28]  Accordingly, the court rejects plaintiff's argument that MSC's Technical

evaluation was arbitrary and capricious.

### iii.  MSC's Past Performance evaluation was rational and supported by the record

Plaintiff contends that it was irrational for MSC to assign a "Substantial

Confidence" risk rating to Patriot, and therefore that MSC's subsequent conclusion that

OSI enjoyed "only" a slight advantage over Patriot was arbitrary.  Plaintiff attacks MSC's

Past Performance evaluation of Patriot on a variety of grounds, including the relevance of

Patriot's prior contracts and whether Patriot's prior experience reflected a similar scope

---

[28] The only evidence plaintiff has uncovered of any such affirmative steps is a suggestion from a
peer reviewer recommending that the Technical Evaluation Report "clarify[] why OSI received
only a rating of "Good", after FPR2, when they had nothing but strengths that seem to indicate
increased quality of performance."  AR 5123.  The evaluators declined to further amend the
TET's report, "because the approach used in the . . . Report had successfully withstood protests
in the past . . . ."  AR 5128.  A peer reviewer's suggestion that an explanation be provided for a
rating is not the same as a suggestion that the rating be changed.

and degree of complexity as would be required under the new contract.  Plaintiff

contends that it was irrational to assign OSI and Patriot the same "Substantial

Confidence" rating in light of the fact that Patriot was found to have only three

"Relevant" and two "Somewhat Relevant" prior contracts, compared to OSI's two "Very

Relevant" one "Relevant," and one "Somewhat Relevant" contracts.  Plaintiff also argues

that, based on comments from OSI's references, MSC should have assigned OSI an

"Exceptional" rating on some of its prior contracts, rather than simply "Very Good."

The court agrees with the government and defendant-intervenor that plaintiff's

argument, at core, is a mere disagreement with how the SSA exercised its discretion.  As

previously noted, this court affords the greatest deference to procurement officials in

matters of Past Performance.  Courts are ill-equipped to discern the relative importance of

an offeror's experience working with gas turbine engines or managing vessels in

Reserve—rather than Full—operating status.  Moreover, as the Federal Circuit recently

noted, it is improper for the court to disturb an agency's Past Performance evaluation by

independently "adding up" and "averaging out" Past Performance evaluations.  Glenn

Def. Marine, 720 F.3d at 909 n.6.  Plaintiff would have the court go a step further:

looking behind the offerors' Past Performance submissions to evaluate whether the

agency properly accounted for the number of ships and their operating status.[29]

---

[29] The court notes that plaintiff's attack on MSC's Past Performance evaluation premised on the
idea that MSC "simply counted the number of [P]ast [P]erformance 'contracts' rather than
'ships' and ignored the actual operational requirements of those ships . . . ." is also untimely
under the aforementioned reasoning of Blue & Gold Fleet, 492 F.3d at 1313.

Particularly in light of the Federal Circuit's recent precedent, plaintiff's approach must be rejected.

### d. Plaintiff's remaining contentions are without merit

The court has considered plaintiff's remaining contentions and considers them without merit.[30]  Having failed to demonstrate that either MSC's Past Performance or Technical evaluations were improper, OSI cannot establish that the agency's best value determination should be set aside.

## III.   CONCLUSION

For the reasons discussed, plaintiff's motion for judgment on the administrative record is **DENIED** and the government's cross-motion is **GRANTED**.[31]  Each party shall bear its own costs.  The Clerk is directed to enter judgment accordingly.[32]

---

[30] Plaintiff's contention that MSC failed to meaningfully evaluate risk of performance is unsupported and contrary to record evidence.  The argument is premised on a strained reading of the solicitation, which states that "evaluators will consider, for each factor . . . the risk of nonperformance, defective performance or late performance under the resulting contract."  AR 241.  MSC's Past Performance and Technical evaluation both reflect consideration of risk.  For example, following the first round of evaluations, MSC acquisition personnel assigned Patriot a weakness because MSC's primary points of contact at Patriot were not initially slated to dedicate 100% of their time to the contract.  AR 4993.  Evaluators also sought clarification from Patriot because of concerns that Patriot lacked sufficient financial resources to perform the contract.  AR 5037.  With regard to Past Performance, the evaluation team acknowledged some of the dissimilarities raised by OSI, such as the fact that the contracts involving USNS Hayes and USNS Waters involved ships that were somewhat dissimilar from the WATSON class LMSR requirement.  AR 4270.

[31] Having failed to establish that OSI was prejudiced by the alleged intervening wage rate escalation or that MSC's Technical or Past Performance evaluations were arbitrary or capricious, the court must **DENY** plaintiff's motion for a permanent injunction.  See Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (plaintiff's entitlement to a permanent injunction requires actual success on the merits).  In addition, having granted the government's cross-motion for judgment on the administrative record, defendant-intervenor's cross-motion for judgment on the administrative record is **DENIED** as moot.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge

---

[32] On April 2, 2014, the court received the parties' proposed redactions to this opinion and the transcript from the court's March 11, 2014 oral argument.  The transcript of the oral argument shall remain sealed.